(33 South. 594.)

No. 14,367.

LEONARD v. SPARKS et al.*

(Jan. 5, 1903.)

PARTNERSHIP — WHAT CONSTITUTES — EMPLOYÉS—RIGHT TO DISCHARGE—DISSOLUTION—NOTICE.

1. It does not necessarily follow that a partnership was formed because in a joint adventure the parties agreed each to receive a share of the profits.

2. Persons may share profits, and not be partners as between themselves. The person who employs two other persons to do certain work, and who, by the terms of the agreement, retains the right to discharge them at will, may discharge one and retain the other in his employ.

3. In that case, even if there exists a partnership between the employés, one of the employés may notify the other that the partnership, quoad the work in question, is dissolved.

4. The steps taken toward dissolution were seasonably taken. Notice was given of the unwillingness of one of the asserted partners to continue the partnership.

5. The judgment below properly settled all amounts to the date that the alleged partnership agreement was dissolved.

(Syllabus by the Court.)

Appeal from civil district court, parish of Orleans; George H. Théard, Judge.

Action by William B. Leonard against Sparks Bros. & McGee. Judgment for defendants, and plaintiff appeals. Affirmed.

---

*Rehearing denied February 16, 1903.

Boatner, Dodds & Boatner, for appellant. Farrar, Jonas & Kruttschnitt, for appellees.

BREAUX, J. This suit was brought by plaintiff, Leonard, to recover the sum of $25,000 (less a credit of $3,279.41, paid June 4, 1900), alleged to be one-half of the amount earned by plaintiff and defendants for feeding and taking care of the mules during the English-Boer War for the British government at New Orleans.

Plaintiff owns a livery stable, and the defendants deal in mules and horses. Plaintiff sets out in his petition that on or about the 1st of October, 1900, he contracted with a major of the English army—Scobel—to feed and care for the mules shipped through this port to South Africa. The rate agreed upon to feed these mules was 35 cents each.

Plaintiff avers that after he had entered into this contract he formed a special partnership with defendants to care for and feed these mules, and that he allowed one-half of the profits to each partner. On the other hand, defendants deny that plaintiff entered into such a contract with them, and they further challenge the truth of the statement that they ever entered into partnership with him.

They urge that they and plaintiff were the joint employés of Major Scobel.

One of the members of defendants' firm— the only member of that firm in this city, and the only one knowing anything about the business—testified that he, not Leonard, the plaintiff, entered into the agreement with Major Scobel, and that at the request of Major Scobel he called on plaintiff, and offered to let him have an interest, which he (plaintiff) accepted.

As a witness plaintiff reiterated that he obtained from Major Scobel this employment, and that it was he (plaintiff) who employed the defendants. Under this agreement, the plaintiff took charge of the mules at the Texas & Pacific yards, and the defendants those at the Illinois Central yards.

The mules were taken care of and shipped as directed, and no disagreement at first arose between plaintiff and defendants. Defendants aver that the quarrels between plaintiff and the employés began on the 12th of November, 1899. The testimony is woefully conflicting as to what took place. McGee,

one of the defendants, as a witness in his own behalf, says that while Major Scobel and Capt. Marsham, his assistant, were at the Texas & Pacific yards, of which plaintiff had charge, they complained of the water in the trough, whereupon Leonard, the plaintiff, insulted the officers grossly; that Major Scobel afterwards sent for him, and said to him, because of the insult, he wished McGee to get rid of him.

We quote from the testimony of this witness: "Major Scobel sent for me, and said: 'McGee, I will have nothing more to do with this man Leonard. He insulted me last night and this morning, and insulted Capt. Marsham.' I told him, 'I would prefer if you will let him stay until the shipment of this stock, as he is interested in this shipment, and after this time it can be settled, and our business closed up.' That Major Scobel replied: 'I will allow it to go on then, but he shall not have anything more to do with it.' He implored me to get rid of him in that way."

Capt. Marsham corroborates the statement of McGee as to what took place, and said that both he and Major Scobel were insulted by Leonard. Leonard denies that he insulted Major Scobel, and says that his relations were always pleasant with him, and that he used no harsh words, as charged; that he had been benefited by the employment, and would not have thrown away the opportunity to earn a fair profit by using harsh language in speaking to his employer.

A few days afterwards Major Scobel left this country for Africa to rejoin his command. On the 22d of November, 1899, Marsham took charge of the business, and from that time made all contracts, and had full authority. As a witness Capt. Marsham said that he did not know what contracts or arrangements had been entered into by Major Scobel with the plaintiff.

He says, as a witness, that "Mr. Leonard was given charge by Major Scobel of the Texas & Pacific yards, and that defendants were given charge of the other yards," as before mentioned.

At the instruction of Capt. Marsham, McGee entered into an agreement to have entire charge of the two yards. Capt. Marsham left the city, and went west in search of mules, and while away wrote to McGee, and, among other things, said, "Arrange, please, Leonard not in the feeding."

Here again arises marked conflict in the testimony. McGee testifies that he gave full, clear, and complete notice to plaintiff, while plaintiff testifies that he was not notified; that he treated as a jest what McGee intended as a notice. McGee with positiveness swears that there was no jest about it, and that Leonard said, in substance, that this feed business was a matter of utmost indifference to him.

On the 30th of December following, the defendants, in a letter, informed plaintiff that all agreement between them was terminated on the 25th of November, 1899; that they had gathered from conversations with plaintiff that he still regarded the agreement in force; that they desired to inform plaintiff that the conditions upon which they were permitted by the officers in their employment were that he should have nothing to do with it. To copy from the letter: "You were informed of that fact by Major Scobel, Captain Marsham, and our Mr. McGee. Since that time you have taken no part in the business. We shall insist that our relations terminated on that day." This letter to plaintiff was written at the instance of Capt. Marsham on the 31st day of May, 1900.

Leonard addressed a letter to defendants, requesting them to send him a statement up to date, with which request they complied. They also sent a check for the balance, which they averred was all that remained due by them to plaintiff. It is in place to state here that auditors were appointed to establish the amount due to the respective parties; that these auditors found that the amount due by defendants to plaintiff to November 22, 1899, and they in a special statement showed the amount of profits after that date. The defendants sent their check for the amount due to the time they contend the agreement terminated.

Defendants sent this in full settlement. Plaintiff accepted it in part payment. Defendants' contention now is that plaintiff is concluded by having accepted the amount they sent, and this gives rise to one of the pleas of the case.

During the controversy in court something was said about halters; that is, about cords and head stalls for confining the mules.

109 LA.—18

Plaintiff charges that defendants had taken advantage of their opportunity to overcharge, and defendants, in turn say that plaintiff knowingly received part of the profits of the asserted improper price collected.

In December, 1901, according to an agreement between counsel, a commission was issued to take the testimony of Major Scobel, in South Africa, at the seat of war, in answer to defendants' interrogatories and plaintiff's cross-interrogatories. A messenger was employed by defendants to carry these interrogatories to Major Scobel. He started after Major Scobel, but when he arrived at Cape of Good Hope Scobel had gone to Pretoria. He was informed that it would be utterly impossible to find him, as his regiment was constantly moving.

The messenger then registered the package, addressed to this witness at Pretoria, and returned to this city. The interrogatories were not answered.

Before closing the statement of facts, we will state that the agreement did not specify the time during which the mules were to be fed, and that there was no agreement regarding partnership unless it resulted from the understanding that the profits were to be equally divided.

The judge of the district court rejected plaintiff's demand.

### Opinion.

At the outset we will state that, if plaintiff and defendants were partners, and the defendants made a second contract at variance with the partnership, it was a breach of duty toward their partner. The agreement to which we have referred, and which was pleaded by plaintiff as creating a partnership, was not written. It is not shown that plaintiff and defendants agreed to become partners. It can only be considered a partnership, if partnership at all, to the extent that it may appear that a partnership resulted from the agreement to divide the profits.

The first employer, Major Scobel, and his successor, Marsham, did not consider the agreement as a partnership, as made evident by the change which was brought about by them after the 22d of November, 1899, to which we have before referred.

Equal shares in the profits do not always make the persons thus sharing partners.

This court has decided that one may share in a profit without being a partner. Collom v. Bruning, 49 La. Ann. 1257, 22 South. 744.

That the relations of partners are not necessarily established between an employer and an employé who stipulate that the employer will receive a proportion of the profits in lieu of a salary. McWilliams v. Elder, 52 La. Ann. 995, 27 South. 352.

"A servant sharing in a profit instead of wages is not a partner." Halliday v. Bridewell, 36 La. Ann. 238; Maunsell v. Willett, Id. 322; Miller v. Chandler, 29 La. Ann. 88.

The intention between the partners inter se must govern. In our case the conflicting testimony does not create the impression that it was the intention of plaintiff and the defendants to form a partnership. We take it that the article of the Civil Code, No. 2801, cited by counsel for plaintiff, provides that profit in the business is one of the essential conditions of the partnership, but nothing more. It does not provide that the interest in the profit is necessarily to be considered, under all circumstances, as constituting the interest of persons partners.

In the last edition of the American & English Enc. of Law, page 31, volume 22, and notes, this subject is referred to, and many decisions are cited, in the main sustaining the view that profit is an essential to a contract of partnership; but it also clearly lays down that there may be circumstances which do not constitute the partnership.

Article 2801 of the Louisiana Civil Code is the corresponding article 1832 of the Code Napoleon. We have referred to French jurisprudence interpreting that article, and found that the agreement between two agents to share in the profits of their joint services to a third person may not be considered as having the character of a partnership. Fuzier-Hermann, vol. 4, p. 458, No. 4. The other articles of this digest are in keeping with the foregoing. The agreement of the stable keepers to share the profits equally may be considered under some circumstances as not having the character of a full and complete partnership.

We translate the text of Laurent, vol. 26, p. 152, as follows: Unquestionably a share

in the profits is essential to a partnership. Without it there is no partnership. But from this it must not be concluded, says the commentator, that all agreement covering this essential necessarily results in creating a partnership.

Here it is not shown that plaintiff and defendants agreed to become partners, nor that a partnership resulted from an agreement as between the parties. The agreement had some of the characteristics of a partnership, it is true; but, even if it were considered as a partnership, it is possible to dissolve it on notice of the intention to bring the contract to an end.

Here notice was given, which we are not inclined to consider in the light of a "jest," as mentioned by plaintiff as a witness.

Plaintiff's contention is, if it be considered that he was notified, then it must be considered that the notice was not seasonable; citing Civ. Code, arts. 2854, 2884.

Granted, for a moment, that there was a partnership between plaintiff and defendants, the renunciation was not unreasonably made. nor the notice unreasonably given.

The employers of the asserted partnership —i. e., the officers of the British army—had not bound themselves to employ it (the defendant firm) for any specified time. As to these officers, it was an agreement to be terminated at will. They had a right to say to this temporary partnership, if it was a partnership: "We do not wish to employ all of you. We will employ the defendant." Their right in this respect cannot well be questioned, particularly if the change was for good cause.

One of the employés can say to the other, even if he considers himself a partner, "I must be released from this temporary partnership in order to continue the employment."

Not having contracted in the work of feeding mules for any particular time, or to take care of any particular number, after proper notice it was possible to bring the agreement to a close.

Learned counsel for plaintiff has quoted in his brief from several decisions in which it was held that an unauthorized attempt by one to oust the other from the position and rights assigned by the contract was a fraud upon the relations which the partners had assumed to each other; citing Marble Co. v. Ripley, 10 Wall. 339, 19 L. Ed. 955; also Karrick v. Hannaman, 168 U. S. 328, 18 Sup. Ct. 135, 42 L. Ed. 484.

In the case here there is this difference: Defendants did not seek to dissolve the so-called partnership on their own motion in order to benefit themselves. but they were notified that, on account of the "unparliamentary utterances" by one of the partners to their employer, they (the employers) would no longer employ all its members; that is, would no longer employ plaintiff and defendants, but defendants alone. If the employers had a right, under the contract, to put an end to the employment, defendants should have the corresponding right inter se of putting an end to the agreement in question.

We pass, without deciding it, the defense based on the asserted complete statement, and the estoppel pleaded by defendants. Our views on other points relieve us from deciding the one just stated.

It would doubtless have simplified the issues if the testimony of the first employer of plaintiff and defendants, Major Scobel, had been obtained. But the parties have expressed their willingness to have the issues presented, as now before us, decided.

We have, in consequence, interpreted the testimony as best we could, and in thus interpreting we have not found that the only disinterested witness regarding the many facts, to wit, Capt. Marsham, was unworthy of belief as charged by plaintiff.

In defendants' answer to the appeal they ask that plaintiff be condemned to pay the costs of the district court.

Plaintiff recovered an amount in the district court due after settlement and liquidation.

We think the costs in that court were properly assessed to defendants, and therefore decline to amend the judgment on appeal.