ELLIS, Judge.
On the afternoon of Feb. 15, 1950 the plaintiff ' had1 been operating a concrete mixer at a'p'lánt'owned and operated by the' defendant, V.' J. Russo-. When something went wrong with the mixer and it became necessary to clean it out, Russo’s pusher or foreman Webster Wiggins ordered plaintiff to get inside of the big concrete mixer and clean it.- While the plaintiff was in 'this mixer, the foreman inadvertently turned on the switch which started the big blades revolving and injured the plaintiff’s knee severely before it could be stopped.
On August 1, 1950 plaintiff filed suit against L. J. Russo, father of V.'JV Russo, and then on February'8, 1951 he filed an. additional suit' against V. J.' RussO. It is fair to state that the two- identical suits were filed against the father and son because counsel for plaintiff did not definitely know which of them owned and operated the concrete block business. It appears that the property upon which it was located belonged to the father, L. J. Rüsso, and that the latter also operated a business located on the same lot or square of ground.
Both.cases came up for trial and it was agreed that the suit against V. J. Russo be first tried and the evidence adduced be used in both cases with the exception of the evidence relating to which of the two defendants was the employer of the plaintiff.
The main defense in the lower court by V. J. Russo was that there was no relationship of' employer-employee and, secondly, that although the defendant admitted that the plaintiff suffered injuries to his left knee he denied disability. In fact, every allegation of plaintiff’s petition except the admission as to the injury to plaintiff’s left knee was denied.
Following the trial of the two cases in the District Court, judgment was rendered in favor of each defendant, and we aré now confronted with’an appeal'b'y the plaintiff. We will disciiss- and decide plaintiff’s case against V. ■ J.' Russo and' for the reasons given in this case, togéther with any further , reasons, the case of plaintiff against L. J. Russo will be separately considered.
It., was .established without dispute that the plaintiff was injured- on the. date alleged while he. was cleaning the concrete mixer in response to the order of defendant’s . foreman. No evidence was introduced'which could contravert.the fact that the ownership of the plant belonged to any one other than V. J. Russo. The testimony further revealed that the concrete -mixing plant was not operated steadily so as "to afford full time, permanent employment to the employees and that, as a matter of fact, only two employees were regularly paid and employed and for this reason, as stated by the defendant, he always had “a big turnover.” In' other words, it was necessary that he ernpio'y new crew members very frequently.
On the day that the plaintiff was injured the employee who had previously been employed to operate the concrete mixing machine had been stricken with appendicitis and it was, therefore, necessary that some one be employed if the plant was to operate. There is no dispute from the evidence but that the plaintiff was hired and put on the job by Webster Wiggins, the defendant’s foreman. Although defendant-referred to him as' a pusher, he was in charge at all times when the defendant was not there, and it is shown by-other employees at the concrete mixing plant that when they were short a man the foreman went out and got one. On the other hand, there was a strong attempt riiade to show that the foreman only had authority to hire the employees designated and .named by the defendant.
In view of the fact that the plaintiff was injured while rendering services for the defendant, this creates a legal presumption that he enjoyed the status of an employee under LSA-R.S. 23:1044, which is as follows:
- “A person rendering service for an-. oth-er"in any of the.'trades, businesses or occupations covered by this Chap *114 ter is presumed'to be an employee under this Chapter.”
The statute above quoted was considered in the case of Harper v. Ragus, 62 So.2d 167, 169, in which the Second Circuit Court of Appeal stated:
“The difficulty in resolving the question lies in determining whether the contractual arrangement is such that the complainant is removed from the status of being an employee within the Workmen’s Compensation Act. The Workmen’s Compensation Act applies to every person performing services arising out of and incidental to his employment in the course of his employer’s trade, business or occupation in certain named hazardous trades, businesses and occupations and a person rendering service for another in any of the trades, businesses or occupations covered is presumed to be an employee. LSA-R.S. 23:1033 and LSA-R.S. 23:1044. * * *
******
“ * * * We think the evidence fails to overcome the presumption which flows from LSA-R.S. 23:1044.”
The burden of proof to sustain the defense that the plaintiff was not an employee rested upon the defendant and it is necessary that the evidence be sufficient to overcome the presumption created in favor of the plaintiff under LSA-R.S. 23 :- 1044, supra.
With regard to the employment of some one to operate the concrete mixer due to the absence of the former employee who performed this duty, the defendant testified that he was told by his foreman that “we had one man missing. He also told me Tanner Franklin was in the quarters. They called it Russo’s Quarters. I asked him to go over and get him and put him to work because I had worked him before.”1 Defendant further testified that so long as his foreman got a man who1 could do the work it was satisfactory to him. According to the quoted testimony, it is well to note that the defendant did not select Tanner Franklin but agreed after being told by his foreman that Tanner Franklin was in the Quarters that he should go over and get him. While defendant contended that the foreman had no authority to employ -anyone without instructions from him and that he usually wanted to know prior to such employment who the foreman was going to, get, when he was asked if he knew whether or not anyone was working at the , plant while he was at the Chevrolet automobile company on business, he answered: “I was hoping somebody was working.”
From defendant’s testimony he ' apparently instructed the • foreman to employ a man but he understood it was to be Tanner Franklin. However, taking all of his testimony, there is po reason to believe that prior to plaintiff’s injury he would have ob-. jected had the foreman suggested plaintiff’s employment rather than Tanner Franklin’s.
Wiggins, defendant’s foreman, testified as follows:
“A. We were short a man; he hadn’t got anybody. His orders were, we were trying to run at night and he hadn’t got there, and I don’t know, be-. cause of him not being there I went out and was hunting a man. First, I went to a fellow called Tanner and he couldn’t come for some cause and I got Tom. I picked Tom up and brought him over.
“Q. When you talked to Tom, what, did you tell him ? A. I asked him, did he want to come to work.
“Q. What did Tom say? A. He would. ■
■ “Q. Did you tell Tom where he would-work? A. I showed him where to work.
“Q. Did you put him to work ? A. Yes, sir, I put him to work.”' '
Again on cross examination he testified:
“Q. We will, change the question around. I will ask you this: When • they were shorthanded, did you some- ■ *115 times go and get people to work at the plant? A. Now, I will give you the lineup bn that. In the morning when he comes and the crew is not there, he is short somebody, he send me out to see if I can find a man for him to put to work.”
According to Wiggins’ testimony, he 'had not seen the defendant that day until after the plaintiff was injured. In this connection he testified:
“Q. You never did see Mr. Russo at all that day until after Tom Stull got hurt? A. No, sir.
“Q. When did Mr. Russo tell you to get somebody to work at the plant ? A. That night.
“Q. That was the night before Tom Stull — A. No, I am wrong: I take it back. We were supposed to go to work that morning and we were short a man that morning but I didn’t see Mr. Russo that morning.
“Q. When did Mr. Russo tell you to get somebody to work? A. He didn’t tell me anything that day because I didn’t see him that morning.
“Why did you go out to get somebody to work? A. I just figured the job had to go, and took it on myself and went.
“Q. When you were short of men, you went out and got them? A. He would be there either in the morning or the evening and say, We are short a man; go and see if you can find somebody.’ ”
The employees of defendant who were placed on the stand testified that Webster Wiggins was the foreman in charge and that he gave the orders when the defendant was not there, that they were working five days a week at that time and when they were short a man the foreman, Wiggins, would pick up a man wherever he could find one. The witness Washington testified that he had seen Wiggins pick up a man “many a time” and that the defendant would pay the man for his work.
It is the plaintiff’s' testimony that after the foreman Wiggins was unable to get Tanner Franklin to operate the concrete mixer that the latter got in touch with him and that he reported to foreman Wiggins who told him “I am going to put you back in the mixer.. If you catch on and run it good, that will be your job.” Wiggins further told the plaintiff how to operate the mixer.
The most unfavorable inference to the plaintiff that might be drawn from the testimony is that the foreman Wiggins had at least implied authority to hire additional men for he had in the past been sent by the defendant Russo to secure an additional man, even though Russo contends that he had to approve the man before the final selection, nevertheless, from the point of view of an employee hired by Wiggins, the em-. ployer had vested Wiggins with implied authority to employ, and the further fact that it was necessary that an additional man be secured in order to operate the plant and that the defendant told the foreman Wiggins to get the crew ready and to get some one to fill out the short crew, and it was the foreman who suggested Tanner Franklin’s name, not the defendant. From the quoted testimony of the defendant it is shown that he was only interested, really, in getting the plant in operation. His defense and testimony that the foreman had only authority to employ the particular person designated by the defendant is not borne out by the record. The testimony falls far short of overcoming the presumption in favor of the plaintiff as an employee of the defendant.
 The defendant has failed to overcome the presumption created by law, supra, and we therefore conclude that plaintiff was an employee of defendant and suffered an accident and injury within the course and scope of his employment.
As to the disability, the doctors clearly state that plaintiff would be unable to perform hard manual labor which required stooping or bending or picking up any heavy object. In the operation of the concrete mixer he was required to lift sacks of concrete. The doctors’ testimony tin- *116 questionably .indicated total disability . as the plaintiff had 50% loss of.flexion of the knee and was unable to stoop, squat, or climb, and according to Dr. Spedele, defendant’s witness, he'was unable to do any hard, steady work requiring climbing or being on his feet continuously.
Defendant offered witnesses to show that plaintiff had been employed as a common laborer on a sewerage laying job in the town of New Roads. The foreman on this sewerage job testified that he recognized the fact that the plaintiff had a stiff leg and could not get in and out of the ditch and that when they assigned him his duties they took that into consideration and made no requirement that he do any labor which required him to get in and out of the ditch. This foreman stated that the plaintiff was a regular worker and a good man except for his disability.
It is therefore apparent that plaintiff, a common laborer, is unable to substantially perform all .the functions of the labor which he was required to perfom at the time of his injury, or, in fact, he is unable to substantially perform at all the duties ordinarily required of any common laborer.
As to the rate of compensation, according to the record the rate of pay would have been 50{J per hour, eight hours per day for a five day week. We accept a five day week in view of the testimony that the defendant’s plant never operated more than five week days.
While plaintiff attempted to prove medical expenses by the- introduction of a bill from Charity Hospital for treatment it was excluded, and although plaintiff stated in court that he would reopen the: note of evidence to present the Charity Hospital medical expense bill, he failed to do- so. We therefore believe that the judgment should reserve any right he or the Charity Hospital might have for the recovery of medical expenses not to exceed $1,000.
For the above reasons, it is therefore ordered that the judgment of the District-Court- be .and the same is hereby reversed and that-there.now be judgment in favor of the plaintiff'Tom Stull and agaipst -the defendant V. J. Russo, awarding plaintiff compensation at the rate of $13 per week beginning February 15, 1950.and payable each week thereafter with interest at the rate of 5% from the maturity of each past due installment, for a period not to exceed 400 weeks.
It is further ordered, adjudged and decreed that the fee for plaintiff’s attorney be fixed at a sum not in excess of 20% of the amount of the award made by this Court and provided that said attorney’s fee shall not exceed $1,000.
It is further ordered, adjudged and decreed that the right of the plaintiff and/or Charity Hospital of New Orleans for the recovery of medical expenses not to exceed $1,000 be reserved to them.
It is further ordered, adjudged and decreed that all costs be paid by the .defendant, V. J. Russo.